Bron Rammell (ISB No. 4389)
Brayden K. Cochran (ISB No. 12178)
MAY, RAMMELL & WELLS, CHTD
216 W. Whitman / P.O. Box 370
Pocatello, Idaho  83204-0370
Telephone:  (208) 233-0132
Facsimile:  (208) 234-2961
bron@mrwlaw.net
brayden@mrwlaw.net

UNITED STATES DISTRICT COURT
FOR THE SIXTH DISTRICT OF IDAHO

|  |  |
|---|---|
| THE ESTATE OF DUSTIN RIZZO, CARL RIZZO, as personal representative of the Estate of Dustin Rizzo and individually, as the father of Dustin Rizzo; VIOLA JOSEPHINE "JODEE" RIZZO, as the Mother of Dustin Rizzo, and BRITNEY ROBERTSON, on behalf of and as the parent and natural guardian of T.R., a minor child, J.R., a minor child, and O.R., a minor child<br><br>        Plaintiffs,<br><br>vs.<br><br>KAYLA STEPHENS, in her individual capacity.<br><br>        Defendant. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |

**COMES NOW** Plaintiffs by and through their attorneys of record Bron Rammell and Brayden K. Cochran of May, Rammell and Wells Chtd., and hereby submits the following Complaint against Defendant(s) as follows:

**JURISDICTION AND PARTIES**

1. This Court has jurisdiction over this action under the laws of the State of Idaho and the United States including 42 U.S.C. § 1983 & 1988.

2. This case involves a federal question and this court has original jurisdiction over the issues in this case.

3. Venue is appropriate in the United States District Court for the District of Idaho as the acts and omissions giving rise to the complaint in this case occurred generally in the State of Idaho.

4. At all times relevant to this matter, The Estate of Dustin Rizzo, ("The Estate" or "Dustin") has been administered in the State of Idaho and Carl Rizzo is the Personal Representative of the Estate.

5. Dustin Rizzo was a resident of the State of Idaho at all material times, and at the time of his death.

6. At all times relevant to this matter, Carl Rizzo ("Carl") was a resident of the state of Idaho.

7. Carl is the adoptive father of Dustin Rizzo and makes his claim as Personal Representative of the Estate and individually.

8. Carl is the adoptive father of Dustin Rizzo and is the grandfather to T.R., J.R., and O.R.

9. At all times relevant to this matter, Viola Josephine "Jodee" Rizzo ("Jodee") was a resident of the state of Idaho.

10. Jodee is the adoptive mother of Dustin Rizzo and grandmother to T.R., J.R., and O.R. and makes her claim as an individual.

11. At all times relevant to this matter, Britney Roberston ("Britney") was a resident of the state of Idaho.

12. Britney is the mother of Dustin Rizzo's children and was Dustin Rizzo's fiancée prior to his death.

13. Britney makes her claim on behalf of the minor children T.R. (Born 2/16/2021), J.R. (Born 12/16/2020), and O.R. (Born 5/11/2023).

14. At all times relevant to this matter, T.R. was a resident of the state of Idaho.

15. T.R. is the minor child of Dustin Rizzo and Britney Robertson.

16. At all times relevant to this matter, J.R. was a resident of the state of Idaho.

17. J.R. is the minor child of Britney Robertson and Dustin Rizzo.

18. Dustin was present at J.R.'s birth and stood in *loco parentis* for J.R.

19. J.R. relied extensively on the financial and emotional support of Dustin.

20. Throughout J.R. and Dustin's relationship, Dustin provided J.R. with care and support, and assumed all ordinary duties of a parent in a child-parent relationship with J.R.

21. At all times relevant to this matter, O.R. was a resident of the State of Idaho.

22. O.R. is the minor child of Dustin Rizzo and Britney Robertson.

23. J.R., T.R., and O.R. currently reside with their mother in Lincoln County, Oregon.

24. Upon information and belief, Kayla Stephens ("Stephens") was a resident of the state of Idaho

25. At all times relevant, Stephens was an employee of the Idaho Department of Health and Welfare ("IDHW") and assigned as a caseworker over T.R. and J.R..

26. At all times relevant, Stephens was acting under the color of law.

27. Stephens is sued in her individual capacity.

28. This action is brought pursuant to 42 U.S.C. § 1983.

29. Plaintiffs are entitled to attorneys fees and costs pursuant to 42 U.S.C. § 1988 for maintenance of this action.

**INTRODUCTION**

30. This civil action seeks redress for the Defendant's outrageous and deliberately indifferent interference with and deprivation of the familial relations and associations that existed between Dustin Rizzo, his minor children, and his parents.  The claims specifically arise under the Fourteenth Amendment of the Constitution of the United States, including the due process and equal protection clauses of the amendment.

31.  Dustin was a 22-year-old father of three, who took his life on July 16, 2023 as a proximate result of Defendants' unlawful and unconstitutional actions under color of state law.

32. The remaining Plaintiffs are Dustin's surviving parents and minor children, who have suffered the devastating loss of their son and father.

33. Plaintiffs bring this action to hold accountable the Defendant, Kayla Stephens, whose misconduct violated each of the Plaintiffs' fundamental rights, and to recover damages for the harm caused.

34. More specifically, Defendant repeatedly abused her authority and trampled on Dustin's, his childrens', and his parents' constitutional rights to due process and equal protection under the Fourteenth Amendment, including their reciprocal rights to the care, custody, companionship, and familial association with each other.

35. Her outrageous actions were ultimately a proximate cause of Dustin's death.

36. Plaintiffs seek compensatory damages for the violation of their civil rights pursuant to 42 U.S.C. § 1983, including for the loss of their family, the loss of Dustin's life, and the loss of companionship, along with damages for the associated emotional distress and other damages.

37. Plaintiffs request a trial by jury on all claims so triable

.

## PRELIMINARY BACKGROUND

38. Dustin was a young father who shared three (3) children with his fiancée, Britney Robertson, when the Defendant's outrageous and deliberately indifferent conduct proximately caused Dustin to take his life.

39. The children are T.R. (DOB: 02/16/2021), J.R. (DOB: 12/16/2020), and O.R (DOB: 05/11/2023) (collectively referred to as the "Children").

40.  T.R. and O.R. are Dustin's biological children.

41.  Dustin stood in loco parentis over J.R.

42. Dustin was a loving and devoted parent to all of three children, and cared for, supported, and assumed all ordinary parental responsibilities over all of the children.

43. Carl and Jodee were the grandparents to the Children, provided emotional and financial support for the children, and shared a close relationship with their grandchildren.

44. They also had a close and good relationship with Dustin and Britney.

45. Like most people, Dustin was not perfect. While he was a very caring and active parent, son, and fiancé, he suffered from anxiety and depressive episodes.

46. On or about July 25, 2022, Dustin and Britney got into a fight and threatened to commit suicide.

47. This was reported to the Department of Health and Welfare, resulting in T.R. and J.R. being removed from Dustin's care.

48. Upon removal from their family, the State assumed limited authority, restricted by the U.S. Constitution and State law to act in the children's best interests, and to preserve their fundamental rights to familial associations.

49. As seen below, Stephens' actions disregarded the Plaintiffs' fundamental rights, and instead actively attempted to thwart and destroy the family connection.

50. There were misrepresentations and other concerns associated with the state's claims and initial removal of the children.

51. The claims in this Complaint are not directed to those issues and concerns, however.

52. Rather, this complaint is about the intentional or deliberately indifferent actions of Stephens, which interfered with and deprived Plaintiffs of their constitutional rights to familial association and companionship.

53. As a result of Stephens' actions, the sanctity of Plaintiffs' family was unwarrantedly interfered with.

54. Stephens' intentional or deliberately indifferent actions (many of which are specifically described below) caused each of the Plaintiffs to suffer lasting and permanent harm and damages.

55. Dustin's actions of taking his life was proximately caused by the shocking and indifferent actions of Stephens.

56. The following addresses a number of the shocking and intentional or deliberately indifferent actions of Stephens and how they led to the destruction of the familial relationship as well as Dustin's death.

## FACTUAL BACKGROUND

57. After the children were initially taken by the state, T.R. and J.R. (O.R. was not yet born) were placed with a foster family with whom they had no prior connection or familial association.

58. Upon information and belief, the foster parents were friends of Stephens.

59. Upon information and belief, Stephens ensured that the foster parents continued to be paid by the State, even after the children were returned to Britney, after Dustin's death.

60. For additional context, Carl and Jodee were entitled to custodial/placement priority under Idaho Code §16-1629(11) as the grandparents of T.R. and J.R.

61. The 14th Amendment protects such relations, and Idaho Code reflects the importance of that interest.

62. Nevertheless, Carl and Jodee were not afforded placement priority, despite having informed IDHW and Stephens of their desire, willingness, and ability to take the children and to provide for their care.

63. Stephens had an affirmative obligation to seek out relatives who were willing and able to be "permanency options" for the minor child[ren] in the event reunification did not occur.

64. Stephens made no known attempt to perform this obligation.

65. Plaintiffs brought this issue up multiple times with Stephens and IDHW, but their concerns were generally just ignored.

66. Instead, false claims that Carl and Jodee were estranged from Dustin and the Children were advanced by Stephens.

67. This occurred despite the fact that Stephens knew that Carl and Jodee were preferred custodians over others with no familial association.

68. On removal of the children, no meaningful attempts were made to contact Carl and Jodee, which was one of the Defendants' statutory duties.

69. Carl, Jodee, and the Children were never able to resolve this particular issue until after Dustin's death.

70. Throughout the events described below, T.R. and J.R. remained in the care of a foster family despite Carl and Jodee's priority and despite the fact that the children's interests and relationships were more protected with Carl and Jodee.

71. Stephens' actions at the time the children were taken were just the beginning of her outrageous behavior.

## STEPHENS' ACTIONS VIOLATED THE 14TH AMENDMENT

72. In effect, and throughout the process, the Defendants treated Carl and Jodee as irrelevant.

73. The children appear to have been seen generally as pawns for Stephens to use against Dustin and Britney.

74. They remain terrified of Stephens, based on their interactions with her.

75. In fact, Carl and Jodee were the safest and most logical caretakers to care for T.R. and J.R. while Dustin and Britney were temporarily prevented from having their children.

76.  Stephens had a duty  under the Constitution and Idaho law to avoid destruction of that relationship.

77. The Children would have been better off with their grandparents.

78. The Children have since expressed how Stephens was very "mean" and the bare mention of Stephens causes them obvious terror.

79. By way of example, when Stephens came to Britney's home after Dustin's death, J.R. yelled that it was "Stephens" and ran away.

80. By way of Stephens' specific acts, because this case involved the taking of children from their parents, Stephens was required by law to develop a Case Plan with the <u>primary objective</u> of reunifying the family.

81. The Case Plan in this case, at least partly, identifies some of Stephens' duties.

82. The Case Plan itself set the primary goal of reunification with T.R. to be achieved no later than twelve (12) months from the date of removal at the latest.

83. It also identified a goal of Dustin's adoption of J.R. within twenty-four (24) months.

84. Initially, Stephens told Dustin and Britney that the plan was for reunification within 9 months.

85. However, when the final plan was presented to Dustin and Britney, Stephens had added 3 months.

86. Dustin and Britney did not complain to Stephens about this seemingly arbitrary change at that time, though it seemed a bit excessive to them.

87. They understood and believed at that time that if they did what was stated in the Plan, that the maximum time for their reunification with the children would be a year, with a good chance it would be sooner.

88. Dustin therefore, willingly accepted the timeline, believing that if he did what Stephens set out in the Case Plan, he would get his Children back at the latest in a year.

89. As required pursuant to Idaho Code § 16-1621(c), the Case Plan is required to specifically identify each task Dustin was required to complete in order to have the Children returned to him.

90. The Case Plan and the statutory and other obligations associated with it are particularly relevant to Stephens' Constitutional violations for multiple reasons.

91.  Stephens' behavior and intentions towards the Plaintiffs, as revealed in the sequence of events shows that Stephens' actions were far beyond ordinary negligence.

92. The final straw occurred when Stephens punished Dustin and Britney and the children by completely suspending any visitation for the sole reason that Dustin and Britney complained that Stephens was saying and doing things that were inappropriate and inconsistent with the familial objective.

93. This occurred less than a month before Dustin' suicide.

94. The Case Plan imposed obligations on Stephens as well as Dustin.

95. Dustin worked hard to fulfill all of the terms required of him.

96. Stephens, not only didn't perform her statutory obligations, she thwarted, hindered and interfered with its completion, preventing the very unification the law and the Plan promoted.

97. For example, the Plan required Dustin to complete counseling services relating to alcohol and drug use.

98. As part of this requirement, the Plan also obligated Stephens to maintain consistent communication with Dustin's counseling service provider and to monitor his progress.

99. The primary purpose of the time sensitive requirement was to ensure prompt and proper progress towards the goal of preserving and restoring the constitutionally protected familial relationships

100.    Dustin completed his counseling services in or around May or early June of 2023.

101.    He did this through an approved counselor at Port of Hope in Nampa, Idaho.

102.    Dustin's counselor reported to Stephens that Dustin had completed his counseling with no reported concerns.

103. Dustin actually completed his counseling with praise.

104. In or around June of 2023, however, Stephens insisted that Dustin attend even more counseling sessions with the same counselor, beyond that established by the Plan and beyond that required by his own appointed counselor.

105. Stephens' arbitrary extra requirement caused the counselor to call Stephens to inform her that Dustin had commendably completed all counseling required of him and that as a result, there was no need for further counseling.

106. This call did not stop Stephens from continuing to claim that Dustin had not fulfilled this term of his reunification and adoption, however.

107. She belittled and criticized Dustin for not doing what she wanted him to do in the way she wanted him to do it.

108. This was a repeated pattern of behavior by Stephens throughout her exercise of authority over the Plaintiffs, which behavior delayed and interfered with the Plaintiffs' unification and familial relationships.

109. Stephens did the same thing again a short time later, when Dustin was preparing to take his Plan mandated Parenting Course.

110. Dustin had successfully completed his Plan required Domestic violence training course and was prepared to take the Parenting Course.

111. When he went to take the course, Stephens insisted that Dustin first take more of the Domestic violence course.

112. Her additional requirements were not part of the Case Plan, the law or required as part of the course itself.

113. Just as with his counseling, Stephens' actions forced the Domestic Violence provider to get involved and inform Stephens that Dustin had completed all required portions of that course.

114. Despite this, Stephens continued to tell Dustin and Brittney that Dustin had to take additional courses in his domestic violence program; regardless of what the provider said.

115. When asked, Stephens would not give Dustin any explanation as to why she was requiring him to take these additional courses.

116. Stephens' refusal to explain her arbitrary requirements was also a pattern of behavior.

117. And when Stephens was asked for an explanation, she would retaliate against the Plaintiffs.

118. Instead of accepting the course provider's report that Dustin had completed all that was required of Dustin in the course, Stephens criticized and blamed Dustin for not progressing in his Case Plan and informed him that the lack of progress was his own fault and told him and Britney that because of Dustin, it was unlikely his family was ever going to be reunited.

119. Stephens' criticisms were extremely confusing to both Dustin and Britney.

120. They wondered in this instance for example why, even though Dustin's domestic violence program provider reported to Stephens that Dustin completed all necessary courses in the domestic violence program, that Dustin was criticized for not making progress in part of the Case Plan.

121. Stephens further did not give Dustin or Britney any clear instructions as to what specific additional courses Dustin was required to take in order to comply with the Case Plan.

122.   When Dustin tried to take the Parenting course, which he had to complete to get his kids back, Stephens refused to let him.

123.   Stephens' claim was that Dustin was not allowed to take the parenting course because Britney was still taking the course.

124.   Stephens arbitrarily told Dustin that he would have to wait and that she would not allow him to take the Parenting Course until **after** Britney finished taking the course.

125.   Dustin expressed frustration that Stephens kept moving the goal on him, which Stephens knew was causing Dustin to get agitated and to spiral towards hopelessness and despondency.

126.   Stephens' actions continued to extend the family's separation and interfere with their fundamental familial rights.

127.   By this time, Dustin, Britney and the children were nearing the 12 month mark, which was the **maximum** length of time for reunification under the plan.

128.   Lengthening the plan would have required court approval, which never occurred.

129.   Nevertheless, Stephens' actions were making it clear that there was no way Dustin and the children would have their full rights restored until Stephens' decided they could.

130.   Because the  Protective Parenting Program required approximately two (2) to three (3) months to complete, any reunification would be delayed beyond the 12 month timeframe in the Case Plan.

131.   Additionally, and upon information received later, Plaintiffs believe Stephens behaved similarly in several other situations involving other families.

132.   Around this same time (June 2023),  Britney was also enrolled in counseling services at Port of Hope.

133. While there, Britney encountered three other people who informed Britney that Stephens was assigned as their case worker, and kept changing their requirements, preventing them from reunifying.

134. One parent even reported that Stephens went so far as to cause her to lose her job as a result of Stephens' conduct.

135. Three (3) others told Britney the same things about Stephens in her AA meetings.

136. Plaintiffs were shocked to learn this, realizing they were experiencing the same thing.

137. After Dustin's death, Plaintiffs were even informed and therefore believe, that Stephens is or was not authorized to work as a caseworker in certain parts of Idaho due to complaints regarding her handling of other parents' case plans.

138. From Plaintiffs' perspective, progress under the Plan came to a halt, with no indication Stephens would allow the family to get together.

139. Plaintiffs were experiencing increasing stress and anxiety over Stephens' actions.

140. Just prior to that, they had been excited to get the kids back and move out of state.

141. Dustin had received approval from his counselor to enlist in the military, and he had done so.

142. He was planning to join the following summer season, and the Plaintiffs were looking forward to this new exciting adventure after they were reunited and Stephens was no longer in their life.

143. When Stephens arbitrarily stopped the reunification process, however, Dustin and Britney became very concerned and complained to Stephens' supervisors, hoping to get some help, clarity and direction.

144. The response from Stephens' supervisor, which is believed to have been Roxanne Printz, but may have been Marinda Squibb, was that they had to do whatever Stephens required, regardless of the circumstances.

145. Unfortunately, Stephens was apparently informed of the Plaintiffs' complaint and Stephens took the complaint out on the Plaintiffs.

146. At a meeting at the Caldwell Center in mid to late June, Stephens took Britney and Dustin aside and told them that they were not doing things the way she wanted them done.

147. She said they were calling unnecessary attention towards her and that if they continued, they would "pay for it."

148. Dustin and Britney were shocked, reported this to Carl and Jodee, and asked if they could involve themselves and to help them possibly get Stephens removed as their case worker based on Stephens' constant criticisms, threats and actions.

149. Sometime later (still in June of 2023) Carl was able to arrange a meeting with Roxanne Printz, Stephens' supervisor to discuss the families' concerns.

150. When Carl, Jodee, Dustin, and Britney showed up at the IDHW offices to meet with Printz, however, she was not present, and had delegated the meeting to another person named Michael, or "Mike".

151. During the meeting, Michael revealed that he had no information about the case at all.

152. He showed up to the meeting without any file, and without even a pen or paper to take notes.

153. The meeting with Michael occurred on a Friday.

154. **Shortly after that meeting, Stephens contacted Dustin and Britney and informed them that she was immediately suspending all visits with the children.**

155. **This complete suspension lasted two (2) weeks**.

156. In this communication, Stephens sent a text to Britney and Dustin telling them that they would have no more visitation with the Children at that time.

157. Privately, as with the previous threat, Stephens informed Britney and Dustin that she suspended their visits because they complained to Stephens' supervisors.

158. Stephens offered no reason justifying this taking of the Plaintiffs' fundamental familial relation rights.

159. To the contrary, Stephens stated that she did not have to give any reason for taking the visitation away.

160. Stephens' actions profoundly affected Dustin, the Children, Carl, and Jodee.

161. This was particularly difficult for Plaintiffs as they had already experienced J.R. and T.R. crying and begging to stay with Dustin and Britney, when they were taken to the foster parents.

162. Stephens was aware of this trauma to the children and appeared to be unmoved by it to any degree.

163. Not knowing what else to do, and desperate to believe that someone at IDHW would care about the situation, Britney and Dustin again reported Stephens' comments and actions to Stephens' Supervisors,

164. In response, Dustin and Britney were again told that they should stop complaining and do what Stephens required, regardless.

165.    Stephens' actions in suspending the relationship for two weeks was purely retaliatory, outrageous and deliberately indifferent to the children's and the other plaintiffs' needs.

166.    Outside of the Plaintiffs' complaint about Stephens' behavior and the meeting with her supervisor, nothing of significance had happened justifying a suspension of visitation.

167.    Despite Roxanne Printz and Marinda Squibb having the power to review, reverse, or otherwise cure any wrongful conduct by Stephens, they continued to allow Stephens' to act as Dustin's case worker, and to act in a shocking manner.

168.    The Plaintiffs' excitement and plans of moving forward had been taken from them by the arbitrary and indifferent actions of Stephens.

169.    Stephens' continuation of shocking and intentional or deliberately indifferent conduct, aggravated Dustin's despondency associated with his lack of control over the situation.

170.    He had been taught by Stephens that even if he did everything expected of him, he could never expect to get his family back.

171.    Ultimately, this led Dustin to believe that he was at the complete mercy of Stephens to satisfy whatever unclear requirements she held over him to complete his domestic violence program.

172.    Carl, Jodee, and the Children also felt this way, as visitation was unwarrantedly suspended from them at what appeared to be Stephens' unfettered discretion.

173.    Furthermore, Stephens had made it clear that Dustin was simply unacceptable as a parent.

174.    She had told Dustin and Britney that she knew a family ready to adopt the children.

175.    Plaintiffs took that to mean that Stephens was planning on giving their children to the foster family, or someone else.

176.    Stephens bluntly told Dustin that he was never going to be able to get his children back.

177.    She even told him **that if he was out of the picture, the kids would already be back with their family.**

178.    Stephens' comments also included statements that Dustin was a bad father, that he was at fault for preventing reunification with T.R. and adoption of J.R., and that he and Britney **would likely never see T.R. and J.R. again or otherwise ever have a normal parent-child relationship with them**.

179.    These remarks were made by Stephens to Dustin with full knowledge of Dustin's mental health issues, including his prior suicidal tendencies.

180.    As a result, Dustin believed that there was no real path to getting the children back.

181.    He expressed helplessness, despondency and lost hope.

182.    In despair, Dustin took his life on July 16, 2023.

183.    By that time the Children had been removed and separated from Dustin and Britney's care and from their grandparents for nearly a year, with no indication that they would ever be able to be reunited.

184.    Stephens' actions shocks the conscious and demonstrates a clear purpose to harm Plaintiffs or deliberate indifference with Plaintiffs constitutional rights.

185.    Stephens' actions significantly impacted Dustin and caused his belief that he was solely responsible for not only his loss of his children, but for the children's trauma and the other Plaintiff's losses as well.

186. Even after Dustin was dead, when Britney called Stephens to report his death, Stephens said something to the effect of "huh, maybe if he had just listened to me."

187. Stephens' comments and behavior were not only designed to deprive the Plaintiffs of their fundamental rights, her behavior proximately caused Dustin's despair, and was ultimately a substantial factor in Dustin's death and the ultimate destruction of the Plaintiffs' relationship with Dustin.

188. Not ironically, J.R. and T.R. were shortly given back to the care of Britney shortly after Dutin "removed himself from the picture."

189. With respect to Dustin's death, Stephens knew or should have known that her actions could push Dustin over the edge and were unwarrantedly interfering with Plaintiffs' familial association and companionship with each other.

190. Her violations of the 14th Amendment caused the Plaintiffs to permanently lose a father and son, and an important source of financial and emotional support.

191. This loss was a proximate result of the Defendants' unconstitutional behavior.

192. As a result of Stephens' shocking and intentional or deliberately indifferent conduct, the sanctity of Plaintiffs' family was unwarrantedly interfered with by Stephens.

193. Stephens' conduct has had long-lasting effects on J.R. and T.R. This has included becoming mute after reunification with Britney, delayed development in their speech, and fear and anxiety over being separated from Britney.

194. As a result of this tragedy, The Estate, Carl, Jodee, T.R., J.R., and O.R. have suffered damages for Stephens' deprivation of their constitutional rights to familial relationship, companionship, due process, and equal protection.

195. As a result of Stephens' conduct, Plaintiffs have suffered damages both general and specific in an amount over $10,000.00.

196. Plaintiffs are entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. § 1988.

## FIRST CAUSE OF ACTION
(Fourteenth Amendment - Violation of Interference with Familial Relationship and Companionship, Due Process, and Equal Protection)

197. The preceding paragraphs are fully incorporated herein by reference.

198. At all times relevant, Stephens was acting under the color of law.

199. The Fourteenth Amendment to the United States Constitution guarantees that no state shall deprive any person of life, liberty, or property without due process of law.

200. The Due Process Clause of the Fourteenth Amendment enshrines a protected liberty interest and fundamental right to familial integrity and association. This right safeguards, among other things, the prerogative of parents concerning the care, custody, and control of their children, as well as the reciprocal right of children to companionship with their parents and to be raised and nurtured by them, free from unwarranted governmental interference.

201. Plaintiffs had a fundamental liberty interest in their familial relationship and companionship, safeguarding them from unwarranted governmental interference during the entire course of events described above.

202. Stephens' either acted with the purpose to harm Plaintiffs or in a manner which was deliberately indifferent to Plaintiffs rights to familial association and companionship.

203.    These actions and course of conduct by Stephens shocks the conscious and included the previously described actions, including the following:

    a.    Stephens arbitrarily delayed the Plaintiffs' progress in being reunified and being together by refusing to advance Dustin in the program after his completion of his required counseling at Port of Hope. This occurred even though the counselor insisted and reported that Dustin had fully completed his counseling requirement;

    b.    Stephens did the same with respect to Dustin's domestic violence course. Stephens' continued to demand that Dustin complete additional courses despite the providers reaching out to her and informing her that Dustin had satisfactorily completed all necessary courses.

    c.    Stephens again arbitrarily interfered with the reunification and delayed Dustin's ability to complete his Protective Parenting Program as she required Dustin to complete his domestic violence course without providing him specific instruction on how to do so and requiring him to unnecessarily wait until Britney completed her Protective Parenting Program.

    d.    Retaliating against the Plaintiffs, including completely suspending Dustin and Britney's visitation with T.R. and J.R. simply because Dustin, Britney, Carl, and Jodee brought concerns about Stephens' conduct to her supervisors.

    e.    By engaging in a course of conduct against Dustin which led him to believe that there was no end in sight to reunification and adoption of J.R. and T.R., that he was at fault for delaying J.R. and T.R.'s return home, and encouraging Dusin to committee suicide, despite having knowledge of his prior suicidal ideation. This

effectively severed any and all familial association and companionship Plaintiffs had with Dustin.

204. Each of the above identified actions caused Plaintiffs' familial integrity, association, and companionship to be deprived of them – without any justifiable cause to do so – as J.R. and T.R. were either prevented from visitation with Dustin, Britney, O.R., Carl, and Jodee.

205. Ultimately and most egregiously, Plaintiffs were permanently deprived of Dustin's love, affection, and companionship through his death which was the proximate result of Stephens' conduct described above.

206. The Fourteenth Amendment to the United States Constitution guarantees that an individual acting under color of law cannot treat individuals differently without a rational basis for doing so.

207. Specific statutes and state laws required Stephens to treat the Plaintiffs in such a way as to protect and foster their constitutionally protected familial rights, and to do so in a fair and equal manner.

208. Without any authority or justification, Stephens' repeatedly treated Dustin and the other Plaintiffs differently than similarly situated parents with their families, without any rational basis to do so.

209. Stephens' singled out Dustin for unusually extreme and punitive treatments, and by doing so singled out the other Plaintiffs as well.

210. Plaintiffs have sustained general and specific damages due to Stephens' violation of their constitutional rights, including damages for the taking of their constitutional protections in and of itself.

211.    The Plaintiffs' damages include pain and suffering, loss of support, loss of services, mental-anguish, and emotional distress.

212.    Plaintiffs are entitled to be made whole again for their damages suffered in an amount determined appropriate by a jury.

213.    Stephens is liable to Plaintiffs for damages arising from her unconstitutional conduct, including both compensatory and punitive damages.

214.    Plaintiffs are entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION
(State-Created Danger and Right to Life)

215.    The preceding paragraphs are fully incorporated herein by reference.

216.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects individuals from unwarranted intrusions on personal security and life by the state.

217.    A state official can be liable when said individual affirmatively creates or enhances a danger that a person wouldn't otherwise face, and the person is injured as a result.

218.    Since the creation of the Case Plan, Stephens' was aware of Dustin's prior suicidal ideation.

219.    While acting as Dustin's Case Worker, Stephens' engaged in a course of conduct which placed arbitrary and unclear requirements on Dustin to complete his Case Plan. As Dustin tried his best to complete the Case Plan, Stephens repeatedly moved the finish line on Dustin, assigned unnecessary tasks for Dustin to complete, unnecessarily required Dustin to wait to take his Protective Parent Program, and encouraged Dustin to committee suicide.

220. By the time Dustin had committed suicide, Stephens made Dustin feel full of grief, lost hope, and despiar whether he would ever see or have his children home again.

221. Stephens' above-stated words, conduct, and control over Dustin ultimately led him to believe he was completely at fault for any delays in reunification with the Children.

222. Importantly, Stephens engaged in this course of conduct and treated Dustin this way despite knowledge of his prior suicidal ideation, anxiety, and depressive episodes.

223. Stephens therefore knew the risk that her conduct and subsequent encouraging of Dustin to commit suicide could result in Dustin having committed suicide.

224. Despite this, Stephens still encouraged Dustin to commit suicide.

225. As a result, the Estate has sustained damages due to Stephens violation of their constitutional rights in an amount to be determined by a jury.

226. The Estate is entitled to be made whole again for their damages suffered.

227. Stephens is liable to the Estate for damages arising from her unconstitutional conduct, including both compensatory and punitive damages.

228. The Estate is entitled to attorney fees and costs for the maintenance of this action pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs pray as follows:

1. For recovery of all special and general damages sustained as a direct and proximate result of Stephens' violation of Plaintiffs' constitutional rights in an amount determined by a jury.

2. For recovery of all reasonable costs and attorney's fees pursuant to federal law, including but not limited to, 42 U.S.C. § 1988.

3. For any and all further relief the Court deems just and equitable.

4. Plaintiffs demand a trial by jury in this matter.

DATED this 15th day of July, 2025.                MAY, RAMMELL & WELLS, CHTD
*Attorneys for Plaintiffs*

*/s/ Bron Rammell*
BRON RAMMELL

*/s/ Brayden K. Cochran*
BRAYDEN K. COCHRAN